# .IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

RENEE W. BYRD,                           )
                                         )
    Plaintiff,                         )
                                         )
v.                                       )          No. 04-1554 (SLR)
                                         )
THE MAY DEPARTMENT STORES CO.,           )
                                         )
    Defendant.                         )

### EXHIBITS TO
### DEFENDANT THE MAY DEPARTMENT STORES CO.'S
### OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**HECKLER & FRABIZZIO**
DANIEL P. BENNETT, I.D. #2842
The Corporate Plaza
800 Delaware Avenue, Suite 200
P.O. Box 128
Wilmington, DE  19899-0128
(302) 573-4800
Attorney for Defendant

January 12, 2006

# EXHIBIT A

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RENEE W. BYRD,                     )
                                   )
          Plaintiff,               )
                                   )
v.                                 )     Civil Action No.
                                   )        04-1554
THE MAY DEPARTMENT STORES CO.,)
                                   )
          Defendant.               )

          Deposition of RENEE W. BYRD taken pursuant to
notice at the offices of Heckler & Frabizzio, 800
Delaware Avenue, Wilmington, Delaware, beginning at 10:00
a.m. on Tuesday, November 29, 2005, before Anne L. Adams,
Registered Professional Reporter and Notary Public.

APPEARANCES:

          MICHAEL E. FRANKLIN, ESQ.
          The May Department Stores Company     RECEIVED
             611 Olive Street                   JAN 09 2006
             St. Louis, Missouri 63101-1799
             for the Defendant.                 H&F

ALSO PRESENT:  Diane G. Rubin

------------------------------------------------------------

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477



**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters
ORIGINAL



EXHIBIT
A

33

1  to summarize, any documents related to Strawbridge's,

2  including pay stubs, but anything, and the same thing for

3  Cohen, any documents for Cohen, particularly pay stubs,

4  your W-2 for '04.  I would also like to get your tax

5  return -- do you have them back to '02?

6      A.    Probably.

7      Q.    If I could get your tax return from '02 to

8  current, '04, any documents related to your receipt of

9  unemployment compensation.

10     A.    I know Delaware is the lowest around and it was

11  either 2 or 300, minus taxed up front.  I did have them

12  tax me up front.

13     Q.    And that was weekly?

14     A.    Yes.

15     Q.    Did you draw it the entire time between

16  Strawbridge's and Cohen, like every week do you know?

17     A.    I would -- my belief is I believe it stopped

18  shortly before Cohen.

19     Q.    Do you remember how long before?

20     A.    No, just shortly.  It might have been a few

21  weeks.

22     Q.    Did you work any part-time jobs in that time

23  frame?

24     A.    No.

34

1    Q.   How did you sustain yourself during that time

2  frame?

3    A.   Basically, cashing out on my retirement.

4    Q.   So you cashed out your retirement from

5  Strawbridge's?

6    A.   Uh-huh.

7    Q.   How much was that?

8    A.   I believe it was approximately 22 before taxes,

9  22,000.

10    Q.   Approximately 2,2000 before taxes?

11    A.   I believe.   I know you have a big chunk of taxes

12  taken out of it for cashing early.

13    Q.   Do you know how much that was?

14    A.   No.   I can only guesstimate.   I think it was over

15  6,000.

16    Q.   Do you have any documents related to that cashing

17  out of the retirement?

18    A.   I don't know if I could find those, but I could

19  look.

20    Q.   That's something else I would add to the list of

21  stuff that would be responsive to our list.

22    A.   But you could help me.

23    Q.   Tell me what you did to try to find a new job

24  during that time frame.

44

1    Q.    Why did you leave Wyeth?

2    A.    To take on -- there was a head hunter, basically,

3    to take on a better paying job at United Gas.

4    Q.    Where did you work prior to Wyeth?

5    A.    Oh, my God.  Now I'm in grade school.  I can't

6    remember.  That was my first main job.

7    Q.    Let me ask you then:  Have you ever been

8    terminated from any position other than at Strawbridge's?

9    A.    No.

10   Q.    Have you ever filed any charge of discrimination,

11   internal or external, against anyone other than

12   Strawbridge's?

13   A.    No.

14   Q.    Have you ever felt like you were discriminated

15   against on the basis of your race at any other job prior

16   to Strawbridge's?

17   A.    No.  At one time, I thought I wasn't hired

18   because I was black.

19   Q.    And where was that?

20   A.    I think the place was called Mr. Donuts.  It was

21   Mr. Donuts.  It was right down the street from my house a

22   few blocks away.  And I applied there.  Once again, I had

23   no employment history.  But I don't believe many kids did

24   at that time that wanted a job there.  And when they did

1    '81.  Or was it earlier?  Approximately '81.  And it was

2    as a second job to help out during the holiday season,

3    stayed on.  Then I was told that I should apply for

4    cosmetics for Estee Lauder.  I was like, what is Estee

5    Lauder?  And then I ended up working there part-time,

6    part-time regular for Estee Lauder and then later on

7    applied for the manager position for Estee Lauder.

8         Q.   So you started out as a seasonal employee?

9         A.   Uh-huh.

10        Q.   What season was it?

11        A.   Probably Christmas.

12        Q.   Do you know who hired you, like a person?

13        A.   No.  But I remember Olive being a personnel

14   manager, a woman named Olive, beehive hairdo.

15        Q.   You don't remember her last name?

16        A.   No.

17        Q.   How long did she work at Strawbridge's?

18        A.   I don't know.

19             MS. RUBINE:  May Company didn't own them

20   then.

21             THE WITNESS:  The store manager was

22   Mr. Heins.

23   BY MR. FRANKLIN:

24        Q.   When did May Company come into the picture and

47

1    become your employer?

2        A.    When I was working with Estee Lauder, so time

3    wise it was '98, '97.

4              MS. RUBIN:    1996 is my recollection.

5        Q.    Around 1996, does that sound like the correct

6    time period?

7        A.    Yes, approximately around then.

8        Q.    What was your position with Strawbridge's around

9    the time that May came on board?

10       A.    Manager for Estee Lauder.

11       Q.    Who was your supervisor at that time?

12       A.    At the time when May took over, I can see her but

13   I don't remember her name.

14       Q.    Did you get a different position?

15       A.    Yes.    When I became pregnant, I realized -- and

16   I'm living in Delaware as counter manager traveling to

17   Exton, which is approximately an hour.    I knew that I

18   needed to find a location closer to the Delaware store.

19   I would have loved to have kept the counter manager spot,

20   but there was no opening.    So, therefore, I had to look

21   to see what sales would be equivalent.    And I was told

22   furniture sales would be a good choice to move to.

23              And then I was told between Christiana and

24   Concord.    I chose Concord because the volume was more.    I

1  thought there would be the opportunity to make more

2  money.  And there was an opening and I was hired

3  immediately.  I was also promised, I believe, it was more

4  commission than what I actually got though.  I was

5  disappointed about that.

6      Q.    And when did this take place, what you are

7  describing, about what year?

8      A.    It would have been in '98.

9      Q.    So you were at the Exton store prior to this

10  time?

11      A.    Yes.

12      Q.    And you were pregnant and wanted to get closer to

13  your home; is that right?

14      A.    Yes.

15      Q.    And so you then approached someone to say, hey, I

16  would like to move closer?  Is that how it started?

17      A.    Yes.

18      Q.    Do you remember who you talked with about the

19  move?

20      A.    I don't remember at Exton who it was with.  And I

21  know for the longest time the store was still in

22  transition.  We had different human resource managers

23  coming through.  They were rotating at times.  So I don't

24  remember who.  Then when I talked to the guy at Concord,

51

1    one, we went from one percent to a half percent.  The

2    first year, I believe, I lost approximately $5,000.

3        Q.    Tell me how you lost the $5,000.  I'm not sure I

4    understand.

5        A.    It might have been, basically, the half percent

6    book.  As counter manager, I made a half percent of what

7    the counter did with the May Company and

8    Strawbridge's/May Company and I made one percent with the

9    book with the Strawbridge & Clothier.  And also, whatever

10   they adjusted the income to be, because they did

11   adjustments for everybody's income, still at the

12   year-end, I knew I would be approximately $5,000 behind

13   and I was.

14       Q.    And that was in the counter manager position?

15       A.    Yes.

16       Q.    Did you have any other positions after '96 or

17   thereabouts when May took over other than counter manager

18   for Estee Lauder?

19       A.    Furniture.  No.

20       Q.    The furniture sales position, was that a

21   promotion or equal level to the counter manager position

22   hierarchically?

23       A.    I would say less frills with it.  So I would say

24   equal if not slightly less, but equal.  I was considered

63

1   program where it goes up.  Only those people who were

2   already in the department before, I believe, May took

3   over received the six-and-a-half I believe.

4       Q.    Did you feel like the decision related to that

5   was discriminatory on the basis of your race?

6       A.    Not on the basis of my race.  I just thought that

7   when you are hired for something and promised something,

8   that it should stick.

9       Q.    Back to Veronica Watson.  You never had any,

10  prior to the termination at least, you never had any

11  dispute with her personally?

12      A.    No.

13      Q.    Were there issues that you complained to her

14  about?

15      A.    Yes.

16      Q.    What were those issues?

17      A.    Three.  I think I can remember one was with the

18  black gentleman stealing the sale and a few with the Lori

19  Ableman, the woman who pushed me, a few about her, maybe

20  a couple at least.  But I know she just had major

21  complaints against her probably losing it.  And then one

22  also about J.D. Sleicher, who is the guy who hit me.

23      Q.    And the black gentleman --

24      A.    Before he hit me, prior.



Renee W. Byrd

66

1    from me, and I went to dispute it with Veronica Watson.

2    It ended up going to corporate and corporate came back

3    giving me credit for one of the sales, not both.

4    BY MR. FRANKLIN:

5        Q.    And were you satisfied with that result?

6        A.    No.  I accepted it but I was not satisfied.

7        Q.    What about Veronica's role in that process, were

8    you satisfied with what she did?

9        A.    Yes.

10       Q.    Do you know Donna Buchanan?

11       A.    Yes.

12       Q.    And how long did you know her at Strawbridge's?

13       A.    I just know her title.  But do I know her

14   personally?  No.  Would I recognize her in a store?  Yes.

15   Would she have a personal conversation with me?  No.

16       Q.    So you never had any personal disputes with her?

17       A.    No.

18       Q.    Was there occasion where you ever complained to

19   her about something along the lines of what we talked

20   about with Veronica?

21       A.    No.

22       Q.    Did you have any problems with her whatsoever?

23       A.    No.

24       Q.    What about Sally Madden, do you know her?

67

```
 1    A.    Yes.

 2    Q.    How do you know Sally?

 3    A.    I don't know if Sally Madden is the one that

 4  called me and told me that I was terminated.  Somebody

 5  from corporate told me I was terminated.  It's between

 6  Sally and I'm forgetting names as well.  Was it her?

 7    Q.    I think.

 8    A.    I believe it was Sally Madden was the one that

 9  called and told me I was terminated.  And also, too, at

10  that time, you know, I was numb about the thing.  I guess

11  I was so sure that because it was reaction and with my 22

12  years of service that I would not be terminated that I

13  was in shock.  I think she even later, I recall her

14  saying that Renee seemed like she was in shock because

15  she took it so well.

16            Also, too, but I know I realized when she

17  said the reason why I was terminated was because of zero

18  percent tolerance, I remember her quote, zero percent

19  tolerance for hitting or pushing, so for that reason,

20  that's when I knew that unfairly I was fired.

21    Q.    Have you ever had any personal disputes with

22  Sally Madden?

23    A.    No.

24    Q.    Have you ever had any problem with her
```



68

1   whatsoever?

2       A.    No.

3       Q.    What about Diane Rubin sitting here to my left?

4       A.    No.

5       Q.    Have you ever interacted with her at the store

6   level when you were at Strawbridge's?

7       A.    No.

8       Q.    Did you ever have any personal disputes with

9   Diane?

10      A.    No.

11      Q.    Did you ever have any problem with her

12  whatsoever?

13      A.    No.

14      Q.    What about Mr. Kelso, how did you know him while

15  at Strawbridge's?

16      A.    Originally, I guess got to know of him first

17  through inquiring about the commission in the beginning

18  of when I was being hired.  So I knew of him at that

19  time.  I met him on the floor before.  I wanted to make

20  sure I introduced myself, put a face to who he was

21  talking to.  I maybe talked briefly about the commission

22  structure when if something was changing I remember, but

23  generally no direct dealings with him.

24      Q.    Did you ever have any personal disputes with him?

69

1    A.    Personal, no.

2    Q.    Did you have any disputes of any kind whatsoever

3    with him?

4    A.    I don't know that I really got to talk to him

5    directly much.  But I know that he was the power to be.

6    Q.    When you say that, what do you mean by that?

7    A.    He was on top of the --

8    Q.    Okay.  When was the last time you discussed your

9    employment or termination or anything with someone in

10   management at Strawbridge's?  That could mean any time

11   after you have been fired up to today.

12   A.    I guess afterwards, and not to really anyone

13   other than Sally Madden, which was probably during the

14   time.  And maybe I called back with some questions and

15   maybe somebody in management questioning my benefits.

16   Q.    What about after that period where you were

17   terminated, you get the word and then there may be some

18   follow-up questions, have you talked to anybody who is at

19   the level management level since that?

20   A.    That would be the follow-up questions with my

21   retirement, questioning things with Sally Madden.  I know

22   I questioned her about the Lori event because it came to

23   mind.  I might have asked Veronica something.  I don't

24   remember in detail.

72

```
 1        Q.    What is that guy's name?
 2        A.    Larry.  And I apologize.  I don't know his last
 3   name.
 4        Q.    And do you know his race?
 5        A.    I believe he's Spanish.
 6        Q.    What did she say about Larry?
 7        A.    She was helping me to find out his last name,
 8   which she probably gave me and I misplaced.
 9        Q.    What's Pat Parsons position?
10        A.    Coworker, same, furniture sales.
11        Q.    What is her race?
12        A.    White.
13        Q.    Did you discuss any other people that you
14   believed may have engaged in an argument or violence of
15   some kind with Pat?
16        A.    No, I can't remember.
17        Q.    When would you have talked to Pat?  Do you
18   remember when that would have been?
19        A.    It could have been a month or two months ago
20   trying to find out Larry's name.
21        Q.    Is that the only time you talked to her?
22        A.    No.  In being coworkers slash friend, we would
23   talk occasionally and how are you doing and she went
24   through surgery, she's out a time, and things of that
```

1    had any personal disputes with Linda?

2    A.    No.

3    Q.    What was your understanding as to why you were

4    terminated?

5    A.    Because of zero percent tolerance.

6    Q.    I understand there was an incident between you

7    and J.D. that led to your termination, correct?

8    A.    Yes.

9    Q.    Were you aware that, at that time, that

10   Strawbridge's had a policy against violence in the

11   workplace?

12   A.    I would hope so.  So I'm going to say yes.

13   Q.    Do you recall ever receiving a handbook from

14   Strawbridge's?

15   A.    Yes.

16              MR. FRANKLIN:  Was going to mark this as

17   Defendant's Exhibit 1.

18              (Defendant's Deposition Exhibit No. 1,

19   Strawbridge's Handbook, was marked for identification.)

20   BY MR. FRANKLIN:

21   Q.    Miss Byrd, I'm going to hand you what the court

22   reporter has marked as Defendant's Exhibit 1.  Have you

23   ever seen a document that looked somewhat like that?

24   This is just a copy but it looks more like this one that

1    I have.

2    A.    That's a newer one obviously.  I don't remember

3    anything being in color like that.  But I would say, yes,

4    I think I have it.

5    Q.    You have one?

6    A.    I think so.  I don't page through here regularly.

7    This is everything thrown together.

8         MS. RUBIN:  Yes, that's one, but you

9    probably got one more recently.

10        THE WITNESS:  Okay.  I don't remember

11   anything in color though.

12        MR. FRANKLIN:  Actually, maybe I will do

13   this at the same time.

14        (Defendant's Deposition Exhibit No. 2,

15   Strawbridge's Handbook Acknowledgment, was marked for

16   identification.)

17   BY MR. FRANKLIN:

18   Q.    Miss Byrd, I'm going to also hand you, at the

19   same time, Defendant's Exhibit 2 and ask you if you've

20   ever seen that document before?

21   A.    Yes, because there is my signature.

22   Q.    That's your signature at the bottom?

23   A.    Yes.

24   Q.    And so does that help you recall -- well, you

Renee W. Byrd

77

1    recall seeing a handbook?

2        A.    I remember seeing one because I have one.

3        Q.    Did you ever read the handbook?

4        A.    Somewhat, yes.  I might be lying if I said I read

5    it page by page by page.

6        Q.    If you will turn to Page 34, there is a Number 13

7    at the top that talks about inappropriate or disorderly

8    conduct while on company time or property.  It goes on to

9    say this includes but is not limited to horseplay,

10   fighting, creating a nuisance or disturbance.  Were you

11   aware that such a policy existed?

12       A.    No.  But fighting is wrong.

13       Q.    Did you understand that it could result in

14   warning or up to termination for engaging in that

15   behavior, for fighting or violence?

16       A.    I would assume somebody could be fired for

17   fighting, yes.

18       Q.    Did you understand that the company had a policy

19   regarding reporting incidents of violence or fighting as

20   well?

21       A.    I would say yes.  I mean, common sense would tell

22   you if something usually happens that you would report

23   it.  I mean, just like I reported when Lori pushed me and

24   nothing was done.

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

Renee W. Byrd

78

1    Q.    Did anyone ever discuss that particular policy

2  with you?  Do you recall someone talking about it?

3    A.    No.

4    Q.    Do you recall the circumstances that led to your

5  termination?

6    A.    Yes.

7    Q.    Can you tell me what took place?

8    A.    On that day, there was a rug that was tripping

9  people.  So we were afraid it would trip the customers.

10  So we would fix the rug.  And there was a group of us

11  around and we were going to fix this rug.  Somebody

12  decided to put books on the corner of the rug, which

13  wasn't too smart because the customer could trip over the

14  books on the rug.  So a suggestion was made to turn the

15  rug.  And I know J.D. pretended to trip over the rug.

16  And I believe I said something like, oh, only that could

17  happen in real life or something like that.  And then the

18  rug was turned and everything was said and done.

19            And I believe shortly thereafter when I said

20  that, I was sitting on the side of my chair.  I was

21  sitting at my desk sideways and sitting on the side of my

22  chair.  And he had taken my stack of books, which was a

23  fairly thick notebook, my notebook, and I wasn't

24  expecting it, and he hit me from behind with the book.

1    My mouth was open and my mouth went slamming down on the

2    back of the chair.  I thought my teeth were gone.  I have

3    taken good care of my teeth and I thought they were gone.

4    I literally thought my mouth was gone.

5              And I remember saying goddamn it, J.D., you

6    made me hit my mouth.  And he started to chuckle.  When

7    he started to chuckle, I honestly lost it.  And I said --

8    like this, to get him away from him.  I couldn't even

9    tell where he was.  And I know that I contacted, later

10    on, around his eye.

11    Q.    I want to note for the record that you were

12    making kind of a swinging motion with your arm.

13    A.    Yeah.  And I know probably my thumb got him,

14    scratched him.  Because I can't really -- I know that

15    when I hit him, I hit him like this.  But I couldn't --

16    and I didn't know what I was going to contact with

17    because I wasn't looking.  It was sort of like this to

18    get away.  And I ended up contacting into his face.

19    Q.    When you say like this, can you describe what you

20    mean?

21    A.    Fist with my thumbnail on the outside.  Because I

22    have long nails.

23    Q.    What I'm hoping you can do for me, if you can

24    remember, I was hoping -- I'm going to give you a sheet

Renee W. Byrd

80

1    of paper.  There were other people present, correct?

2        A.    Okay.

3        Q.    I was going to see if you could do a sketch where

4    you were.  Where were you when this took place?

5        A.    I was at my desk.

6        Q.    I'm a terrible artist, so --

7        A.    Me too.  You are going to see that in a second.

8        Q.    Is that you that you've drawn there?

9        A.    Yeah, that's me.  And I'm sitting sideways on my

10   desk.

11       Q.    Can you put "me" next to it?  What is that coming

12   out at like a 45 degree angle at what appears to be your

13   head there?

14       A.    My hand.  I don't know why.  I don't need a hand

15   there.  This would be J.D.

16       Q.    And the rug is over there by him somewhere?

17       A.    The rug was in this area right here.

18       Q.    And he's got the book in his hand there?

19       A.    Uh-huh.

20       Q.    How far away from the rug are the two of you

21   there?  How far of a distance were you?  Not there, but

22   in real life.

23       A.    The rug was right behind my desk.

24       Q.    So how far?  Do you know?



Renee W. Byrd

81

1    A.    A foot.

2    Q.    Can you write in "a foot?"  So that's behind you,

3    the rug?

4    A.    Uh-huh.

5    Q.    Were there other people in the --

6    A.    Uh-huh.

7    Q.    Who was there?

8    A.    I believe Pat was approximately here.  Shirley

9    was definitely here.  I don't remember which male was

10    there.  A couple people had just walked away I believe.

11    Maybe Jack.

12    Q.    Jack Doyle?

13    A.    Uh-huh.

14    Q.    About where their names are is about where they

15    were located?

16    A.    I believe so.  I know Pat was walking away.  And

17    Pat is hard of hearing.  But I know Pat was about there I

18    believe.  I just -- and that's remembering voices and

19    positions where they were.  From sitting from behind when

20    I was hit, I don't know who was where.

21    Q.    You were sitting with sort of the, facing the

22    back of the chair; is that right?

23    A.    No.  It was a straight-up chair, but it was

24    trimmed in wood similar to this.  And it didn't, of

Renee W. Byrd

82

1 | course, have sides to it.  So my legs were on the side

2 | like this.  So when he hit me, my teeth -- my mouth was

3 | open because I wasn't expecting to be hit -- slammed

4 | against the chair.

5 |     Q.    So you were sort of sitting sideways in the

6 | chair --

7 |     A.    Exactly.

8 |     Q.    -- but with your head turned maybe at an angle

9 | that was sort of over the back part?

10 |     A.    I don't know.  It just went perfectly down on the

11 | wood.

12 |     Q.    And the wood was on the back of the chair?

13 |     A.    Uh-huh.

14 |     Q.    Did your teeth bleed?  Did you have any bleed?

15 |     A.    I think a tad but not severely.  Initially when

16 | it happened, I thought the teeth were gone, like they

17 | were loose and busted.  And I had throbbing for weeks,

18 | which I will say by the end of the month was slight, but

19 | it was from a heavy throbbing, like I knew something was

20 | wrong.  And it subsided eventually.  But it was there for

21 | a long time.

22 |     Q.    The hit that he gave you on the back of the head,

23 | was that itself hard?  In other words, did you receive an

24 | injury?  Would that have been hard enough to cause an

Renee W. Byrd

85

1   remember?

2       A.    Riddle Hospital I believe, which is in, I think

3   it's considered Lima, PA.

4       Q.    And do you know, is that where he's regularly

5   stationed at the time or would you just meet him there?

6       A.    No, I think that's the doctor's office, the

7   specialist.  I believe that is his office.

8       Q.    But you were referred to him by your regular

9   doctor?

10      A.    Yes.

11      Q.    When did you notice that your tooth chipped?

12      A.    I don't remember exactly.  It was, of course,

13  months after it happened.  And then it was where it

14  became very bothersome.  And when I say chipped, too, in

15  regards, it's almost like it was a pocket, a cavity that

16  had created from it and then it was becoming a nuisance.

17      Q.    Do you think this happened on or about February

18  27, '04, the incident with J.D.?

19      A.    Yes.

20      Q.    How much time do you think passed from the moment

21  he hit you until you struck him?

22      A.    Probably seconds.  I believe it was seconds.  And

23  so enough for me to say goddamn it, J.D. you made me hit

24  my mouth from hearing him chuckle, seconds.  It was a

1  reaction.  If I had to do it all over again today, I

2  would run over to personnel instead.  But it was a

3  reaction.  I think most people's reaction would have been

4  the same.  I'm so, so sorry I made you hit your mouth if

5  it was an accident.  But to sit there and let me hit my

6  mouth and then to chuckle about it seems purposely,

7  intent.

8      Q.   When you said to him if only that could happen in

9  real life when he was going over the rug, what was the

10  context of the tone of that comment?

11     A.   Like only if he was going to trip really,

12  jokingly saying only if you could trip really, something

13  like that.

14     Q.   Had you and J.D. had any disputes, one way or the

15  other, that day prior to the incident?

16     A.   No.

17     Q.   Had there been a recent occurrence like within

18  the week?

19     A.   No.

20     Q.   Is there anything else you remember specifically

21  about what happened from the moment you said if only that

22  could happen in real life to the moment that you were

23  finished hitting him?

24     A.   After that I remember things.  I remember that he

87

1    had disappeared and, I believe, went to the restroom.    As

2    I'm looking in the mirror at my mouth and see what's

3    going on, making sure nothing is coming out and all that

4    and going through the throbbing, I remember him coming

5    out.    And I remember that I said something like I'm sorry

6    for hitting you as he was going to go towards the

7    escalator as to go down the steps.    And he didn't

8    acknowledge anything.    And I probably said something to

9    the effect sorry for hitting you.

10                And I know -- I don't know when I commented,

11   but I remember commenting you shouldn't have hit me.    And

12   he never --    I know I apologized to him and he never

13   apologized to me.

14       Q.    You were looking in a mirror there at your chair

15   still?

16       A.    Not at my chair.    But it's a furniture

17   department.    So there is tons of mirrors around.    A

18   mirror of a dresser that was right around the corner from

19   my desk.

20       Q.    So you didn't go to the restroom to do that?

21       A.    No.    I looked right in the mirror.

22       Q.    During the time when you hit him, you it's your

23   testimony you weren't facing him?

24       A.    No, not directly.

Renee W. Byrd

88

```
 1      Q.    Could you see him at all?

 2      A.    I probably could somewhat because I knew where he

 3   was.  He was like at the angle behind me.

 4      Q.    How many times did -- can I call it a fist?

 5      A.    Yeah.

 6      Q.    How many times did your fist strike him?

 7      A.    I don't know.  At least twice, probably no more

 8   than three.

 9      Q.    Do you remember if you ever came up out of your

10   chair when you were hitting?

11      A.    Yes, I was out of my chair.

12      Q.    Were you fully standing up?

13      A.    I would assume so.

14      Q.    Were you standing up each time you hit him or

15   were you gradually coming up?  How did that work if you

16   recall?

17      A.    That I don't recall.  But I believe -- I don't

18   know if I was doing it as I was standing up to find out

19   where he is.  I don't know.

20      Q.    Did anybody say anything while you were hitting

21   him?  Did he say anything?  Did you?  Did any witnesses?

22      A.    No.  I remember J.D. saying something.  And I

23   don't remember what he said though.  It might have been

24   like, "ou," what are you doing?  And then I know that's
```

89

1    when it was over.

2        Q.    Did you see any marks on his face when you were

3    finished?

4        A.    Not until when he came out, you know, from the

5    bathroom going down the steps.

6        Q.    What did you see when he came out of the

7    bathroom?

8        A.    I believe it was like redness there.

9        Q.    Did you see him again after that?

10       A.    We worked together again the following, if my

11   recollection, it might have been -- it was a Friday.  It

12   might have been his weekend off.  And, therefore, I saw

13   him when he came back I believe.

14       Q.    What did he look like when he came back in terms

15   of --

16       A.    I don't remember if it was black and blue.  I'm

17   recalling it might have been black and blue.  But I don't

18   remember that I saw that.

19       Q.    Do you remember specifically where you struck him

20   with your fist?

21       A.    I didn't know where -- when I hit him, I didn't

22   know where I contacted.  When he came out of the

23   bathroom, it was obvious that I contacted him somewhere

24   around the eye.

90

1    Q.    Do you think your nail hit him at all --

2    A.    Uh-huh.

3    Q.    -- or just the body of your fist?

4    A.    I think it was my nail.

5    Q.    Did Jack Doyle saying anything?  And I'm talking

6    about just in this immediate time frame like right after

7    it was over.  Did he say anything about it?

8    A.    No.

9    Q.    Did Shirley?

10   A.    Shirley -- I think everybody -- no, I don't

11   remember anybody saying anything directly.

12   Q.    At the time this happened, did you have anybody

13   there that you thought of as a friend?

14   A.    Uh-huh.

15   Q.    And who would those people be?

16   A.    I would say Shirley and Pat, anybody on the floor

17   probably, excluding J.D.

18   Q.    Who was your best friend if you had to pick one?

19   A.    I would say Shirley because she's my desk

20   partner.

21        MR. FRANKLIN:  I'm going to mark that as

22   Defendant's Exhibit 3.

23        (Defendant's Deposition Exhibit No. 3,

24   Diagram, was marked for identification.)

1    over in the main store?

2        A.    Uh-huh.

3        Q.    How often did you go over to the main store?

4        A.    Probably every Friday to get the check and who

5    knows what else, to shop possibly.

6        Q.    The policy that we looked at a minute ago in

7    Exhibit 1, did you violate that policy when you struck

8    him?

9        A.    It looks like I did, yes.

10       Q.    Did you violate policy by not reporting what

11   happened with him hitting you and you striking?

12       A.    No, because he was reporting and I knew I would

13   have to give feedback.  So it would be reported as well.

14       Q.    So you knew that he was going to report it?

15       A.    Uh-huh.

16       Q.    How did you know that?

17       A.    Once again, you make some assumptions.  Your gut

18   feeling you are right.  And when he was leaving the

19   building, I thought he was going to go across the street.

20       Q.    So it was based upon your assumption of what you

21   saw him going to do?

22       A.    Yes.

23       Q.    So Veronica comes that same day to talk to you,

24   correct?



93

1    A.    Yes.

2    Q.    What does she say?

3    A.    Renee, I need to find out what happened.  And,

4    basically, I gave her my report of what happened and then

5    had to write it out as well.

6    Q.    What do you recall telling her?

7    A.    The same thing I told you earlier.

8    Q.    Did she tell you anything about what he reported

9    to her?

10   A.    Not in so much -- I don't remember.  She might

11   have said that he phrased something.  But, basically, he

12   was going over there because I hit him, not because he

13   hit me first.

14   Q.    So did you get the impression when she spoke to

15   you that he had not told her about him hitting you with

16   the book?

17   A.    No, I'm not saying that.  I don't know.  But I

18   know, probably, his main complaint was not to complain he

19   hit me first.  It was to complain about I hit him.

20   Q.    Sure.  I see what you are saying.

21           Do you recall any other details about what

22   you discussed with Veronica at the time you spoke with

23   her?

24   A.    No.



Renee W. Byrd

94

1    Q.    I'm just talking about this one time.

2    A.    No.

3    Q.    And she had you write out a statement?

4    A.    Yes.

5              (Defendant's Deposition Exhibit No. 4,

6    Written Statement, was marked for identification.)

7    BY MR. FRANKLIN:

8    Q.    Renee, I'm going to hand you what's been marked

9    as Defendant's Exhibit 4 and ask if you recognize that

10   document.

11   A.    Yes.

12   Q.    Tell me what that document is.

13   A.    That's what I wrote up for Veronica as to what

14   happened.

15   Q.    Is that your signature at the bottom where it

16   says "Renee Byrd?"

17   A.    Yes.

18   Q.    It says "V. Watson" and then it says "per

19   Veronica" below that.  Do you know whose writing that is?

20   A.    I assume it's all Veronica's handwriting, even

21   though the last part looks different, per Veronica.

22   Q.    You don't know whose handwriting that was?

23   A.    No.

24   Q.    At the time you signed this or any time

95

1   thereafter before the meeting with Veronica ended, did

2   you see her write that part at the bottom?

3       A.    No.  I think that was done afterwards.

4       Q.    Would you read that carefully and tell me if you

5   see anything in your statement that you think is not true

6   and correct as you sit here today?

7       A.    No.  It sounds very much on the money.

8       Q.    The last line says, "I reacted without thinking

9   by hitting him back sideways."  When it says back

10  sideways, what does that mean?

11      A.    In other words, he was behind me and to the side.

12  That's when I describe earlier about my fist action not

13  knowing exactly where he was.

14      Q.    It doesn't mean that's like a movement his body

15  made or anything like that?

16      A.    No.

17      Q.    Do you remember if Veronica discussed with you

18  whether you called him a fucking asshole?

19      A.    I don't remember that at all.  But I know that I

20  didn't say that.

21      Q.    If you look at Veronica's handwriting or whoever

22  wrote that, it says, "Renee hit J.D. while facing

23  forward."

24      A.    Yeah.  I don't know what she means by that

96

1   unless, because as I said I was in the diagram, Diagram

2   3, I was sitting sideways.  And when I stood up, I didn't

3   know his position.  I was not facing him.

4       Q.   Can you describe J.D. for me physically, how

5   tall, how much he weighs, that kind of thing?

6       A.   He's probably six, two and he would be considered

7   built, someone who exercises, lifts weights.  He's

8   considered built.

9       Q.   How do you compare in terms of height?

10      A.   With my heels, maybe the same height, but

11  definitely not built, more skinny.

12      Q.   So Veronica comes and meets with you and you do

13  the statement which is Exhibit 4?

14      A.   Yes.

15      Q.   What is the next step in this process leading up

16  to the termination?  What happens?

17      A.   Basically, that was it.  And nothing was said.  I

18  believe it was J.D.'s weekend off.  We worked together

19  one day.  And then at the end of -- yeah, we worked

20  together one day together since that.  And then I believe

21  it was Monday or so.  At the end of the day, I was told I

22  was on probation.

23      Q.   And who told you that?

24      A.   I believe it was Veronica.

1    Q.    So you think the 27th, February 27th was a

2    Friday?

3    A.    It sounds right.

4            MS. RUBIN:  Well, this year, August 27 was a

5    Saturday.  So it makes sense last year.

6            (Thereupon, a discussion was had off the

7    record.)

8    BY MR. FRANKLIN:

9    Q.    So February 27th you believe is a Friday?

10   A.    Yes.

11   Q.    And then that's the day when you had the incident

12   with J.D., correct?

13   A.    Uh-huh.

14   Q.    Also the day when Veronica spoke to you and you

15   wrote the statement, which is Exhibit 4?

16   A.    Yes.

17   Q.    And then you didn't work that weekend?

18   A.    I did work that weekend.

19   Q.    Do you remember, each day?

20   A.    Uh-huh.

21   Q.    Saturday and Sunday?

22   A.    Saturday and Sunday.

23   Q.    Did you have any conversations with anyone from

24   management on either of those days about the incident?

Renee W. Byrd

98

1      A.    I don't believe so.

2      Q.    And then you believe you and J.D. would have

3   worked together then on the following Monday, March 1st?

4      A.    I believe so.  I know we worked one day together.

5   The only reason I'm a little hesitant, usually we have a

6   long weekend.  But I believe we worked together one day.

7   We definitely worked together one day.  Maybe he didn't

8   have his long weekend for whatever reason.  He had a

9   special schedule anyway.

10     Q.    And you were suspended on that day?

11     A.    Monday I believe, yeah.

12     Q.    Which was March 1st?

13     A.    Yeah, at the end of the day.

14     Q.    What time would that have been?

15     A.    Close to 6.

16     Q.    And tell me how that came to happen that you were

17  suspended.

18     A.    My recollection -- and I'm not a hundred percent

19  sure -- that Veronica must have called me over and told

20  me at that time.  And she's getting all her notices from

21  corporate.

22     Q.    Do you recall anything you said to her?

23     A.    No.  I might have asked how long will it take to

24  make a decision.  I really thought I wasn't going to get

99

1    fired.

2        Q.    Did she have a conversation with J.D. at that

3    time too do you know?

4        A.    I believe so.  But earlier or either maybe -- I

5    don't know.  I remember we were together one day.  So he

6    might have been off.  He might have worked Saturday but

7    we were together one day after the incident because I

8    remember recalling that people thought that that was

9    strange that they let us work together.  I remember

10   either Sally or Linda asked me, you guys worked together

11   a day and you got along that day?  And I said yeah.

12   That's why I recall us working together one day.  But

13   then it was also he had some time off that we weren't

14   together.  But we definitely, after the incident, worked.

15       Q.    J.D. is white, correct?

16       A.    Yes.

17       Q.    So you are suspended on that Monday?

18       A.    I believe so.

19       Q.    What happened next?

20       A.    I believe they told us we would know within a

21   short period of time.  And it was a tad longer than what

22   they originally thought.  And I remember calling in and

23   they still didn't know and having conversations with

24   someone from corporate.  And then, eventually, I believe

1   it was the 4th -- some reason that day stands out in my

2   mind, March 4th -- receiving a phone call from home from,

3   I believe it was Linda, saying about zero percent

4   tolerance and that they had to terminate me.

5       Q.    Is it possible it could have been March 3rd or

6   4th?

7       A.    I guess.

8       Q.    You think it was from Linda now, not Sally?

9       A.    Yeah, one of the two.  It wasn't Diane.

10      Q.    What did they tell you in that conversation?

11      A.    That I was terminated and the reason why was for

12  zero percent tolerance.

13      Q.    You are certain they used those terms, "zero

14  percent tolerance?"

15      A.    Yes, 100 percent.

16      Q.    Do you recall anything else they said to you in

17  that conversation?

18      A.    You might have some questions.  Here's the number

19  you can contact us.  Because I believe later I saw

20  somewhere that, something that read that Renee seemed

21  like she was in shock or something.  But I remember I

22  guess I didn't respond.  Basically, I accepted it like

23  saying okay and, you know, and I didn't seem to be angry.

24  And I think she thought I was sort of like in shock about

105

1    Q.    Do you recall any other details about the

2    specifics of your conversations after you were terminated

3    with the management folks?

4    A.    No, no, other than what I already stated.

5    Q.    From the point of suspension until you were done

6    with these conversations that we've just discussed, is

7    there any reason why you didn't mention that you felt

8    discriminated against on the basis of your race in that

9    time period?

10    A.    I guess it's not in my gender to talk black and

11    white.    I mean, then you have to look back at the

12    situation and try to figure out why is she still there if

13    it's zero percent tolerance and I'm not.

14    Q.    Is that why you think your race played a role is

15    because --

16    A.    Possibly.

17    Q.    Has anyone ever given you a different reason for

18    your termination other than the violence policy?

19    A.    No.

20    Q.    And can you tell me what happened to J.D.?

21    A.    He was also fired.

22    Q.    How did you know that?    How did you know he was

23    fired?

24    A.    Whoever called me told me both of us were.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

114

1   also I, you know, I didn't get a promotion five years

2   ago.  And I think that was because of my race.  That's

3   what I'm asking.  For this lawsuit, you are just focused

4   on the termination?

5       A.    Yeah, I'm going to focus on the termination.  The

6   commission part before, looking back where I thought it

7   was wrongly done, I could not prove it was because of my

8   race.

9       Q.    And I just wanted to get that just for the

10  record.

11      A.    I don't know.  But I can't provide -- I don't

12  know.

13      Q.    Sure.  What are the reasons that you think that

14  this was because of your race, discriminatory, the

15  termination?

16      A.    Because Lori is a white woman who pushed me.

17  Nothing seems to happen to her, all the wrongdoings that

18  I know that was in her file.  But as soon as Renee, the

19  black woman, does one thing and has an excellent file, I

20  was terminated.

21      Q.    Have you ever heard anyone at Strawbridge's make

22  any comments that you found to be negative or

23  discriminatory on the basis of your race?

24      A.    Repeat it.

1    Q.    And we'll just do it since May came into the

2    picture, from about '96 until your termination.   During

3    these May years, have you ever heard anyone in management

4    make any derogatory comments of any kind that you felt

5    were racist, negative or derogatory on the basis of your

6    race?

7    A.    Not that I could recall.

8    Q.    Now, then, you mentioned earlier and you

9    mentioned just now that it seems your concern arises from

10   Lori not being terminated and Larry, correct?

11   A.    Right.   More so Lori.

12   Q.    Other than Lori and Larry, are you aware of any

13   other individuals who have, from your perspective,

14   violated this policy for violence and not been

15   terminated?

16   A.    Not that I'm aware of.

17   Q.    Other than J.D., are you aware of any white

18   employees who violated the same policy and were

19   terminated?

20   A.    No.

21   Q.    Are you aware of any African-American associates

22   who were placed on warning for violating violence in the

23   workplace provision?

24   A.    No, just one that was fired.



116

1    Q.    And that's you?

2    A.    No, that black gentleman that was in my

3    department.

4    Q.    I'm talking about the violence policy though.

5    A.    Okay.  No.  I'm not even sure why he was fired.

6    Who knows?

7    Q.    Sure.  Tell me the details of what was involved

8    with Larry, the situation with Larry.

9    A.    I recall seeing him get into a fight.  He was at

10   work.  But he was working and the fight had taken place,

11   I believe, right outside the store.  Another associate

12   helped him, I guess was helping him.  He was literally

13   fighting with two other people at least.  And then the

14   other guy got in it to try to help him.  And I believe

15   his name was Mike.  And it was over quickly.  And

16   basically with Michael trying to help get Larry back into

17   the store, and I believe mall security came.  And I don't

18   think anything came up about it.  The guys were probably

19   escorted out of the building and Larry came back to work.

20   Q.    Do you know who the guys -- who was he fighting?

21   A.    Two shoppers.  I don't know.  Somebody he had

22   acquaintance with but they weren't employees.

23   Q.    And that's what I was wondering.  You don't know

24   who they are but you do know they weren't employees?

Renee W. Byrd

117

1     A.    Yes, they weren't employees.

2     Q.    And tell me what they were doing to each other.

3     A.    It was a brawl.  It was more than one, two.  It

4   was one, two, three, four, back and forth.  It was a

5   brawl.

6     Q.    How did you come to witness that?

7     A.    You hear commotion and we have an overlook into

8   the mall.  We can see into the mall.  And, basically, I

9   was on the second floor looking over and watching it.

10    Q.    Were they outside the store?

11    A.    Right outside the store.

12    Q.    How far outside the store would they have been?

13    A.    Five feet, six feet?

14    Q.    Five to six feet?

15    A.    Uh-huh.

16    Q.    Who else was there with you witnessing?

17    A.    That I don't recall.  I believe there was another

18  male.  I don't know which one at the time.  It might have

19  been Jack.  My guess it would be Jack.  But I believe

20  also Janice, who worked with Larry, recalled it, was

21  there.  But she would have been downstairs.

22    Q.    And did they make any comment about it, Jack or

23  Janice?

24    A.    I don't recall.  I'm sure it -- Janice's



WILCOX & FETZER LTD.
Registered Professional Reporters

1    personality, it would have shocked her.  And I believe

2    she was one person who saw the fighting.  And this was a

3    while ago though.  It had been before my incident.

4        Q.    How long before your incident?

5        A.    I don't recall.

6        Q.    Can you give me an estimation?

7        A.    I will say months more than a year.  No, more

8    within the months term versus a year.

9        Q.    Say that again.

10       A.    I will say months before versus over 12 months.

11   I think it was within a 12-month period versus over a

12   year.

13       Q.    So you think it was less than a year?

14       A.    I believe that, but I'm not a hundred percent

15   sure.

16       Q.    And who was Mike?  What's Mike's last name?

17       A.    I don't remember.  I don't know that I ever knew

18   it.

19       Q.    Did he actually get involved in the fight?

20       A.    Maybe slightly trying to help his buddy out.

21       Q.    Do you know if Mike was there when you were

22   terminated?

23       A.    No.  I think he was either terminated or quit

24   before then.

119

1    Q.    Do you know if he was terminated or quit?

2    A.    No.

3    Q.    What was Mike's race?

4    A.    Black.

5    Q.    Do you know if he was terminated as a result of

6    his involvement in this?

7    A.    No, he was not.

8    Q.    Do you know if anybody reported this fight that

9    involved Larry and, to some extent, Mike?

10   A.    I'm not sure.

11   Q.    How come you didn't report it?

12   A.    I don't know.  Put it this way:  I don't know if

13   it was reported officially, but the manager probably

14   eventually knew of it.

15   Q.    Why do you think that?

16   A.    I know Janice's personality.

17   Q.    So is it fair to say that you base that upon your

18   knowledge of Janice wanting to gossip?

19   A.    In a fresh way of saying it, yes, but, no, not

20   even saying gossip.  I wouldn't necessarily use that

21   word.  I guess you could use that word for lack of words.

22   But she's one that would tell all.

23   Q.    But you are not personally aware of anyone going

24   to a management person and saying, hey, Larry got into a



1  fight?

2      A.    I don't recall.  If I had to go by my gut

3  feeling, Nancy probably was aware of it eventually.

4      Q.    And what is that based on?

5      A.    Gossip then.  After that it would become gossip

6  that somehow it got to her.

7      Q.    So you heard from someone else that it --

8      A.    I don't remember that.

9      Q.    Was Larry still there when you were terminated?

10     A.    I don't remember.  But he was definitely there a

11  long time after the fight.  You know what I mean?  I

12  don't think he's still there now.  I believe yes.

13     Q.    Tell me what happened with you and Lori.

14     A.    One day I was going to get a price off of a sofa

15  that was in the back corner of our store.  And that was

16  where her desk was located.  She was on the phone.  You

17  could figure out later that it was a personal

18  conversation that she was having because of her reaction.

19  But when I went to the back to get the price off and I

20  had to cross her desk, she said don't come back here.

21  She was on the phone literally and said don't come back

22  here.

23              And she stood up.  And I could care less

24  whether she was on the phone having a personal

1   conversation.  I just wanted to get the information off

2   of the sofa that was past her desk.  And she literally

3   got up and pushed me as hard as she could.  I wasn't

4   expecting it.  And I went like flying to try to catch my

5   balance.

6                   I was very upset about what had happened.  I

7   literally, like J.D., went to go march across to go to

8   the other side of the store to report her.  And instead,

9   as I said, I turned around and came back because I was

10  thinking going over I should it report it to my manager

11  first.  And I did do that.

12      Q.    Who was that?

13      A.    That was Randy Schifiano.

14      Q.    And what did you tell Randy?

15      A.    Basically what had happened.  And I believe that

16  he said he would talk to her.  I know she was talked to.

17  And, again, this is a while ago.  This is years before

18  what happened to me and J.D.  She was talked to.  She

19  wrote me an apology letter saying she was sorry.

20      Q.    Do you have a copy?

21      A.    I do.  Saying she was sorry.  And that was it.

22  And then I remember later on coming -- I know eventually

23  I went to Veronica and told Veronica.  I remember one

24  time even I sat in with Joanne and told her only because

1    Lori had so many incidents about her and she was so

2    unprofessional on the floor with different things that

3    they were telling us that they were looking for things to

4    add up against her.  And anything she did we would report

5    it.  She must have done one more thing and I sat down

6    with Joanne and Joanne said we are taking care of it.

7        Q.    Who is Joanne?

8        A.    The store manager.  And this might have been a

9    gap since she did what she did to me, but it was in a

10   fair amount of time.

11       Q.    Tell me where her hands hit you when she pushed

12   you the first time?

13       A.    I don't remember.  But if I had to recall,

14   probably on my back.

15       Q.    You think you were facing away from her?  Were

16   you moving away from her when she pushed you?

17       A.    I don't recall.

18       Q.    Were there any witnesses?

19       A.    I don't remember.  But Mike Hargraves might have

20   seen it.  But I'm not sure.  It's a while ago now.

21       Q.    Do you remember if you had any bruising from

22   where she pushed you?

23       A.    No bruising.

24       Q.    Did you have any injury, physical reaction at

1    all?

2        A.    No.    Just gut reaction was very unprofessional

3    for her to push me like she did.    It was with intent to

4    really keep me away from an area where she had no

5    business.    I'm trying to get a price off of a sofa for a

6    customer and a stock number.    And she's having a personal

7    phone conversation and she didn't want me to interfere,

8    which I could care less.    I would have walked around and

9    came back out.

10                MR. FRANKLIN:    Take a five-minute break and

11    I will make a copy of this.

12                (Defendant's Deposition Exhibit No. 8,

13    Apology Letter, was marked for identification.)

14    BY MR. FRANKLIN:

15        Q.    Back on the record.

16                Miss Byrd, I'm going to hand you what has

17    been marked as Defendant's Exhibit 8.    Can you tell me

18    what that document is?

19        A.    It's an apology letter from Lori Ableman.

20        Q.    How did this come to be in your possession?

21        A.    It was given to me either directly from her or

22    through my manager.    I don't recall.

23        Q.    And tell me exactly why this happened.

24        A.    I assume she wrote the apology letter --



124

1    obviously, she wrote the apology letter for pushing me to

2    forgive her.

3        Q.    How do you know that?

4        A.    Because it was given to me after the fact, after

5    pushing me and after Randy talked to her.

6        Q.    Did you say anything to her after you received

7    this?

8        A.    I don't recall.  I know that I asked for the

9    store to, basically, ask her to stay away from me.

10       Q.    Who did you present that request to?

11       A.    Somebody in management.  It would have either

12   been Randy or Veronica, probably Randy.

13       Q.    What was the response to that?

14       A.    I don't recall.  I'm sure that they probably

15   asked her to behave herself sort of speak.

16       Q.    Did you say or do anything after she pushed you

17   to her?

18       A.    No, nothing at all.  I didn't react back.  Didn't

19   react back like I did with J.D., no.

20       Q.    Was that the only time that she did something to

21   you physically?

22       A.    Yes.

23       Q.    Is that the only time you witnessed her do

24   anything physical to anyone?

1    A.    I would say yes.

2    Q.    Did you ever hear that she was physical with

3    anyone else?

4    A.    I don't recall.

5    Q.    And this would have been a year or two before you

6    were terminated?

7    A.    She wasn't -- to my recollection, I believe this

8    happened in '99.

9    Q.    Do you recall at all if, at the time that this

10   happened, if this was still during the time frame when

11   there were changes taking place as a result of the May

12   Company coming in?

13   A.    No, they were done.

14   Q.    You've asserted a claim for damages in this case,

15   correct?

16   A.    I guess -- the reason why I'm saying yes and

17   hesitant, part of my claim was I would have liked my job

18   back.

19   Q.    And that's still part of what you are requesting?

20   A.    Well, I don't know if that can happen with you

21   all being dissolved. So I don't know. But that was also

22   part of it. To be honest, I thought I was -- if you look

23   at the character person that I was, that I was really --

24   I mean, yes, I know that I hit J.D. and it was a

1  child.

2     Q.   Have you ever been diagnosed as being depressed?

3     A.   No.

4     Q.   Have you ever been diagnosed as having any

5  psychological issues?

6     A.   No.

7     Q.   Can you think of any individual, other than who

8  we discussed today, who may have information related to

9  the claim that you are making in this case?

10     A.   No.  Out of all of the names we've mentioned, I'd

11  probably just, saying it a different way, that everybody

12  on the floor was aware of Lori pushing me, could probably

13  remember saying, oh, yeah, that was another thing she

14  did, including J.D.  That's about it.  And names who knew

15  about it other than Joanne, Veronica, people on the

16  floor, Mike Hargraves and Randy, and including J.D.

17     Q.   And as you sit here right now, have you told me

18  all the details that support your claim of race

19  discrimination?

20     A.   I believe so.

21     Q.   Can you think of any document or anything that

22  you might look at that would help you remember additional

23  details?

24     A.   No.







PENGAD 800-631-6989

DEPOSITION
EXHIBIT